## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Clarence and Tammy Frost, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>Lion Brand Yarn Company,<br><br>        Defendant. | Civil Case No.:24-cv-00950(KMM/LIB)<br><br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** |

## <u>PRELIMINARY STATEMENT</u>

This case presents the Court with a question of first impression in the Eighth Circuit: whether the ADA requires online-only sales establishments to ensure that their websites are accessible to the blind.

Defendant correctly points out that there is a federal circuit court split on whether an online-only business, absent a nexus to a physical location, can constitute a "place of public accommodation" under Title III of the ADA. But Defendant misleads the Court when it suggests that the Department of Justice (DOJ) favors Defendant's position because it has not yet promulgated any regulations indicating "the DOJ intended for Title III to apply to cyberspace." (Defendant's Memorandum, at page 8). For more than 20 years, the DOJ has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by a public accommodation, including those

offered by websites and regardless of whether the website is associated with a physical location.

Concluding that the ADA applies to physical places, but not places in cyberspace, requires the Court to read an artificial distinction into the act that appears nowhere in its text; is out of step with today's society; and results in the repugnant conclusion that Congress intended to protect disabled individuals from discrimination by businesses that have physical locations but permit them to be discriminated against by those businesses that sell their wares on-line.

For the reasons set forth below, the Court should hold that Plaintiffs state a claim under the ADA. The Court should also hold that the MHRA applies to websites because the broad language of the MHRA permits no other conclusion.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………………………………. 1

FACTUAL ALLEGATIONS……………………………………………………….. 3

STANDARD OF REVIEW………………………………………………………….7

ARGUMENT………………………………………………………………………...7

THE COURT SHOULD HOLD THAT PLAINTIFFS HAVE STATED A CLAIM UNDER THE ADA………………………………………………………………. 7

THE DOJ'S LONGSTANDING POSITION………………………………………… 9

THE CIRCUIT SPLIT………………………………………………………... 10

PRINCIPLES OF STATUTORY CONSTRUCTION……………………………….. 15

THE TEXT OF THE ACT…………………………………………………………15

REMEDIAL STATUTES……………………………………………………............ 15

THE PURPOSE OF THE ADA…………………………………………………………15

COMMON PARLANCE………………………………………………………………... 17

LEGISLATIVE HISTORY…………………………………………………………... 19

THE UNITED STATES SUPREME COURT………………………………………… 21

FEDERAL DISTRICT COURTS……………………………………………………… 22

PLAINTIFFS' MHRA CLAIM………………………………………………………… 23

CONCLUSION………………………………………………………………………… 24

## FACTUAL ALLEGATIONS

The Plaintiffs and the members of the putative class are blind and low-vision individuals who are reliant upon screen reader technology to navigate the Internet. (First Amended Complaint (FAC), at ¶ 7).

Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y. 2017) (J. Weinstein). (FAC, at ¶ 8).

The screen reading software uses auditory cues to allow a visually impaired user to effectively use Websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring him or her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. *Id.* The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight-impaired individual reaches a link that may be

"clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable." … Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a Website by listening and responding with his or her keyboard. *Id.*

When digital content is properly formatted, it is universally accessible to everyone. When it's not, the content provider fails to communicate with individuals with a visual disability effectively. In turn, these individuals must expend additional time and effort to overcome communication barriers not applicable to sighted users, which may require the assistance of third parties or, in some instances, deny outright access to the online service. (FAC, at ¶ 14).

Defendant claims to be "one of the leading distributors of knitting and craft yarn in the United States and other countries." In order to browse, research, or shop online and purchase the products and services that Defendant offers, individuals may visit Defendant's Website [www.lionbrand.com], where Defendant makes its products available for sale to the public. (FAC, at ¶ 24).

Defendant owns, operates, and/or controls its Website and is responsible for the policies, practices, and procedures concerning the Website's development and maintenance. Defendant and/or Defendant's Website is a place of public accommodation. (FAC, at ¶ 24).

Plaintiff Tammy Frost has, for thirty or so years, been a knitter. Over the course of the years, she has knitted a variety of things such as scarves, blankets, and baby blankets, etc. (FAC, at ¶ 26.). On occasion, Plaintiff Tammy Frost has come across a particular

knitting project that either calls for or suggests obtaining the yarn from Defendant or that Defendant has the necessary yarn available. (FAC, at ¶ 27). On many occasions, Plaintiff Tammy Frost has purchased Defendant's yarn from certain stores such as Joann Fabrics. (FAC, at ¶ 28).

Plaintiff Tammy Frost has also visited Defendant's Website on a number of occasions in connection with her interest in knitting, to browse and determine if Defendant had yarn for purchase that would suit her needs and for the purpose of purchasing Defendant's yarn. (FAC, at ¶ 29).

Plaintiff Tammy Frost recalls at least three separate occasions when she visited Defendant's Website, encountered difficulties, and was unable to complete her intended purchase independently because Defendant's Website conveyed confusing, disorienting and non-sensical information to her screen-reader. (FAC, at ¶ 30).

Plaintiff Tammy Frost does not have eyes and is completely blind. Her husband, Plaintiff Clarence Frost, has severe low vision. They are both dependent on the use of screen reader technology to navigate the internet. Neither of them, independently or together, could or has ever been able to navigate and understand Defendant's Website or complete an online purchase of yarn from it without assistance. (FAC, at ¶ 31).

As a consequence of their experience visiting Defendant's Website, including in the past year, the Plaintiffs' brought the Website to the attention of the undersigned counsel. Counsel completed both automated and manual audits of the Website, all of which confirmed Plaintiffs' description of their user experience and that the Website did not afford individuals who are dependent upon screen-reader technology a full, equal, and

independent opportunity to enjoy a user experience equal to that available to Defendant's sighted customers, and failed to ensure effective communication with screen-reader-dependent users through the provision of accessible electronic and information technology. For example:

    a. Defendant's Website fails to alert screen readers to pop-up window content such as a "Subscribe and Save $15% on Your Next Order" opportunity and instead conveys non-sensical, confusing, and disorienting information. Instead, screen reader technology narrates the content of the Website's underlying page. As a result, pop-up content Defendant deems sufficiently important to convey to its sighted Website visitors is completely unavailable to screen reader users;

    b. The Website does not provide sufficient screen reader-accessible text equivalent for important non-text image(s) such as various color swatch choices of yarn for sale. People who are blind will not be able to understand the content and purpose of images, such as pictures, illustrations, and charts when no text alternative is provided. Text alternatives convey the purpose of an image, including pictures, illustrations, charts, etc.;

    c. Defendant's Website has inaccessible unordered drop-down menu lists which are unrecognized by screen reader technology. Users who depend on screen reader technology should know if and when unordered lists are presented and available for viewing; and

    d. Defendant's Website conveys information visually and via color as the only means of conveying information and without audible narration, including sales prices that have been reduced from $5.99 to $4.19" making the information unavailable to screen reader users.

(FAC, at ¶ 32).

Still, Plaintiffs would like to, intend to, and will attempt to access Defendant's Website in the future to browse, research, or shop online and fully intends to continue their practice of purchasing the products and services that Defendant offers from time to time. Plaintiffs, and other knitters who purchase yarn, typically do not know or have a plan in

place to purchase yarn on a specific date in the future. Instead, they purchase yarn on an as needed basis, depending on the nature of the particular knitting project that is going to be undertaken. (FAC, at ¶ 33).

Defendant's policies regarding the maintenance and operation of its Website fail to ensure its Website is fully accessible to, and independently usable by, individuals with vision-related disabilities. (FAC, at ¶ 34).

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "When reviewing a Rule 12(b)(6) motion to dismiss, a court must 'tak[e] all facts alleged in the complaint as true, and mak[e] reasonable inferences in favor of the nonmoving party.'" *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014).

## ARGUMENT

## THE COURT SHOULD HOLD THAT PLAINTIFFS HAVE STATED A CLAIM UNDER THE ADA

The ADA's "sweeping purpose" is to "remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001). It "prohibits discrimination based on disability in major areas of

7

public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." *Access Living of Metro. Chicago v. Uber Techs., Inc*., 958 F.3d 604, 607 (7th Cir. 2020) (internal quotations omitted).

Title III's general non-discriminatory mandate provides that:

"No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations *of any place of public accommodation* by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added).

Title III also includes specific provisions requiring, *inter alia*, that "[a] public accommodation *shall* furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). (emphasis added). Auxiliary aids and services include but are not limited to, screen reader software. 28 C.F.R. §§ 36.303(b)(2), (4).

Title III identifies numerous private entities that are considered "public accommodations," including, *inter alia*, "a bakery, grocery store, clothing store, shopping center, *or other sales* or rental *establishment.*" 42 U.S. Code § 12181(7). (emphasis added). Plaintiff alleges that Defendant is a sales establishment (albeit an online-only one) and that Defendant violated the ADA by failing to make its website compatible with and accessible by screen reader programs -- thereby denying individuals with visual disabilities the full and equal benefits of the website and denying them effective communication.

Although the statute does not directly say so, the Defendant asks the Court to conclude that a website is not a "place" within the meaning of the ADA, a conclusion the Defendant and several courts reach by applying various tools of statutory construction. As

a result, Defendant claims that it is free to discriminate against disabled individuals such as the Plaintiffs if it chooses to do so. For the reasons discussed herein, the Court should reject Defendant's position and find that the allegations in the Complaint are sufficient to state a cognizable claim for relief under Title III of the ADA.

## THE DOJ'S LONGSTANDING POSITION

The DOJ first announced its position that Title III applies to websites of public accommodations in a 1996 letter from Assistant Attorney General Deval Patrick responding to an inquiry by Senator Tom Harkin regarding the accessibility of websites to blind individuals. Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, Department of Justice, to Tom Harkin, U.S. Senator (Sept. 9, 1996), https://www.justice.gov/crt/foia/file/666366/download.

In 2000, based on the language of the statute, and the underlying purposes of the Act, the DOJ argued to the Fifth Circuit that a business providing services solely over the internet is subject to the ADA's prohibitions on discrimination on the basis of disability. Brief of the United States as Amicus Curiae in Support of Appellant, *Hooks v. Okbridge, Inc.*, No. 99-50891 (5th Cir. June 30, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/hooks.pdf ("A COMMERCIAL BUSINESS PROVIDING SERVICES SOLELY OVER THE INTERNET IS SUBJECT TO THE ADA'S PROHIBITION AGAINST DISCRIMINATION ON THE BASIS OF DISABILITY.") (emphasis in original).

In 2002, the DOJ argued to the Eleventh Circuit that there need not be a nexus between a challenged activity and a private entity's "brick-and-mortar" facility to obtain

coverage under Title III. DOJ argued that Title III applies to any activity or service offered by a public accommodation, on or off the premises. Brief for the United States as Amicus Curiae in Support of Appellant, *Rendon v. Valleycrest Productions,* No. 01-11197, 294 https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/rendon.pdf

In 2014, DOJ entered into a settlement agreement with America's then-leading internet-only grocer to remedy allegations that its website was inaccessible to some individuals with disabilities. Settlement Agreement Between the United States of America and Ahold U.S.A., Inc. and Peapod, LLC, DJ 202-63-169 (Nov. 17, 2014), https://archive.ada.gov/peapod_sa.htm

And as recently as 2022, DOJ published "Guidance on Web Accessibility and the ADA," reiterating that DOJ "has consistently imposed the ADA's requirements upon all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web." Civil Rights Division, Department of Justice, Guidance on Web Accessibility and the ADA (Mar. 18, 2022), https://www.ada.gov/resources/web-guidance/

## THE CIRCUIT SPLIT

There is a split among the courts on the issue of whether an on-line only sales establishment is a place of public accommodation within the meaning of the ADA.

### The Third, Sixth, Ninth, and Eleventh Circuits

The Courts of Appeals for the Third, Sixth, Ninth, and Eleventh Circuits have concluded that "places of public accommodation" are physical structures, and the only goods and services that a disabled person has a "full and equal" right to enjoy are those

offered at a physical location. Discrimination only exists if the discriminatory conduct has a "nexus" to the goods and services of a physical location.

They base their conclusion largely on the text of ADA listing physical locales as examples of "public accommodations." *Ford v. Schering–Plough Corp.,* 145 F.3d 601, 612–13 (3d Cir. 1998) (" … a public accommodation is a [physical] place.... This is in keeping with the host of examples of public accommodations provided by the ADA, all of which refer to [physical] places."); *Peoples v. Discover Financial Services, Inc.,* 387 Fed.Appx. 179, 183 (3d Cir. 2010) ("Our court is among those that have taken the position that the term [public accommodation] is limited to physical accommodations."); *Parker v. Metro. Life Ins. Co.,* 121 F.3d 1006, 1010–11 (6th Cir. 1997) (*en banc* ) ("As is evident by § 12187(7), a public accommodation is a physical place and this Court has previously so held."); *Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104, 1114 (9th Cir. 2000) ("Title III provides an extensive list of 'public accommodations' in § 12181(7) ... All the items on this list, however, have something in common. They are actual, physical places where goods or services are open to the public, and places where the public gets those goods or services.... [T]his context suggests that some connection between the good or service complained of and an actual physical place is required."); *Gil v. Winn-Dixie Stores, Inc.,* 993 F.3d 1266 (11th Cir. 2021) (vacated and remanded, Dec. 28, 2021).

<u>The First and Seventh Circuits</u>

By contrast, the Courts of Appeals for the First and Seventh Circuits reach the conclusion that "places of public accommodation" need not be physical structures, and

discrimination may occur when the goods or services of a "place of public accommodation" are enjoyed by customers who never visit a physical location.

In *Carparts Distribution Center., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.,* the Court of Appeals for the First Circuit relied on the use of the word "of"— as compared to "at" or "in"—in 42 U.S.C. § 12182(a), and the inclusion of "travel service" in the statute's list of public accommodations (a type of business at the time of the statute's passage that often did not have a physical location), to hold held as follows:

> "By including "travel service" among the list of services considered "public accommodations," *Congress clearly contemplated that "service establishments" include providers of services which do not require a person to physically enter an actual physical structure.* Many travel services conduct business by telephone or correspondence without requiring their customers to enter an office in order to obtain their services ... To exclude this broad category of businesses from the reach of Title III and limit the application of Title III to physical structures which persons must enter to obtain goods and services would run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public."

37 F.3d 12, 19–20 (1st Cir. 1994) (emphasis added).

In *Doe v. Mutual of Omaha Insurance Co.*, the Court of Appeals for the Seventh Circuit held that the

> "core meaning of [section 302(a) of Title III of the ADA], plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Website, or other facility (*whether in physical space or in electronic space*), that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do."

179 F.3d 557, 559 (7th Cir. 1999) (internal citation omitted) (emphasis added). The same court held in *Morgan v. Joint Administrative Board, Retirement Plan of the Pillsbury Co. and American Federation of Grain Millers, AFL–CIO–CLC* :

12

"The defendant asks us to interpret "public accommodation" literally, as denoting a physical site, such as a store or hotel but we have already rejected that interpretation. An insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store. The site of the sale is irrelevant to Congress's goal of granting the disabled equal access to sellers of goods and services. What matters is that the good or service be offered to the public."

268 F.3d 456, 459 (7th Cir. 2001) (internal citations omitted).

<u>The Second Circuit</u>

The leading case in the Court of Appeals for the Second Circuit on this issue is *Pallozzi v. Allstate Life Insurance Co.,* 198 F.3d 28 (2d Cir. 1999), *opinion amended on denial of reh'g,* 204 F.3d 392 (2d Cir. 2000). It indicates that the court shares the view of the First and Seventh Circuits. In *Pallozzi,* a couple alleged that their application for a joint life insurance policy had been denied by Allstate because of their mental disabilities. The question on appeal was whether Title III of the ADA "regulate[s] insurance underwriting practices." *Pallozzi,* 198 F.3d at 31.

The court started with the text of Title III, noting that the statute named an "insurance office" as a "public accommodation" and that "[s]ection 302(a) bars a 'place of public accommodation' from 'discriminat[ing] against [an individual] on the basis of disability in the full and equal enjoyment of [its] *goods* [and] *services.* ' " *Id.* (quoting 42 U.S.C. §§ 12181(7)(F), 12182(a) ) (alterations and emphases in original). Rather than taking a literal approach to the term "insurance office," it sensibly held that the

"most conspicuous "goods" and "services" provided by an "insurance office" are insurance policies. Thus, the prohibition imposed on a place of public accommodation from discriminating against a disabled customer in the enjoyment of its goods and services appears to prohibit an insurance office from discriminatorily refusing to offer its policies to disabled persons...."

13

*Id.* (citing *Doe v. Mutual Omaha Ins. Co.,* 179 F.3d 557, 559 (7th Cir. 1999) ).

Allstate argued that the ADA was only concerned with physical access because Congress defined "the term 'public accommodation' to include 'insurance *office[s],* ' not insurance *companies* ," and that "because insurance policies are not actually used *in* places of public accommodation, they do not qualify as goods and services '*of* [a] place of public accommodation." *Id.* at 32 (quoting 42 U.S.C. § 12181(7)(F) and 42 U.S.C. § 12182(a) ) (emphases in original). The court rejected this argument as

> "unpersuasive. Title III's mandate that the disabled be accorded "full and equal enjoyment of the goods, [and] services ... of any place of public accommodation," [ 42 U.S.C. § 12182(a) ], suggests to us that *the statute was meant to guarantee them more than mere physical access.*"

*Id.* at 32 (emphasis added). It then cited to a quotation from *Carparts*:

> "*To ... limit the application of Title III to physical structures ... would severely frustrate* Congress's *intent* that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public."

*Id.* (quoting *Carparts,* 37 F.3d at 20) (emphasis added).

The Second Circuit Court of Appeals emphasized that it is the sale of goods and services to the public, rather than how and where that sale is executed, that is crucial when determining if the protections of the ADA are applicable:

> We find no merit in Allstate's contention that, because insurance policies are not used in places of public accommodation, they do not qualify as goods or services "of a place of public accommodation." The term "of" generally does not mean "in," and there is no indication that Congress intended to employ the term in such an unorthodox manner in Section 302(a) of Title III. Furthermore, many of the private entities that Title III defines as "public accommodations"—such as a "bakery, grocery store, clothing store, hardware store, [or] shopping center," 42 U.S.C. § 12181(7)(E), as well as a "travel service, ... gas station, office of an accountant or

lawyer, [or] pharmacy," id. § 12181(7)(F) —sell goods and services that are ordinarily used outside the premises. On Allstate's interpretation, a bakery's refusal to sell bread to a blind person would fall outside the scope of the statute. *We see no basis for reading the statute so narrowly.*

*Id.* at 33. (emphasis added).

## PRINCIPLES OF STATUTORY CONSTRUCTION

### THE TEXT OF THE ACT

The ADA *does not state that websites cannot be considered places of public accommodation*, and its text should not be read to imply such a conclusion for the reasons expressed by the fifth, seventh, and second circuits and the reasons that follow.

### REMEDIAL STATUTES

"As a remedial statute, the ADA must be broadly construed to effectuate its purpose." *Noel v. New York City Taxi and Limousine Comm'n,* 687 F.3d 63, 68 (2d Cir. 2012) (internal quotation marks omitted). See also, e.g., *Steger v. Franco, Inc.*, 228 F.3d 889, 894 (8th Cir. 2000).

### THE PURPOSE OF THE ADA

Congress passed the ADA because it found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). The purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C § 12101(b)(1).  The ADA is a "broad mandate" with the "sweeping purpose" of "eliminat[ing] discrimination against disabled individuals"

and "integrat[ing] them into the economic and social mainstream of American life;" "one of the Act's most impressive strengths ... [is] its comprehensive character." *PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001).

"Today, few areas are more integral to 'the economic and social mainstream of American life' than the Internet's websites." *Del-Orden v. Bonobos, Inc*., No. 17-cv-2744, 2017 U.S. Dist. LEXIS 209251, at *24 (S.D.N.Y. Dec. 20, 2017) (quoting *PGA Tour, Inc. v. Martin* (internal alterations omitted)). This is especially true for individuals with disabilities. As the National Federation of the Blind has explained:

> In many ways, individuals with disabilities rely on Web content more so than their nondisabled peers because of inherent transportation, communication, and other barriers. A blind person does not have the same autonomy to drive to a covered entity's office as a sighted person. A deaf or hard-of-hearing person does not have the same opportunity to call a covered entity's office. A person with an intellectual disability does not have the same ability to interact independently with the staff at a covered entity's office. The 24-hour-a-day availability of information and transactions on covered entity Websites and mobile apps provides a level of independence and convenience that cannot be replicated through any other means. That is why the number of Americans who rely on the Internet has increased year after year and why entities offer information and transactions through that unique medium.

*See* Comment from disability rights organizations to DOJ Supplemental Advance Notice of Proposed Rulemaking "*Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities*," C RT Docket No 128, RIN 119 -AA65, Answer 57 (October 7, 2016) (citations omitted).

> Given that the very purpose of the ADA is to bring individuals with disabilities in to the economic and social mainstream of American life, and considering that Defendant's commerce is conducted online, the only way for individuals with disabilities to access Defendant's products is through a computer. Therefore, this Court finds that Defendant had notice that if its for-profit products — which are sold

through the internet — could only reach individuals without a vision impairment or other disability, Defendant would be violating the ADA.

*Suchenko v. ECCO USA, Inc*., No. 2:18-cv-562, 2018 U.S. Dist. LEXIS 139050 (W.D. Pa. Aug. 16, 2018).

As the Court aptly put in *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 398 (E.D.N.Y. 2017), "It would be a cruel irony to adopt the interpretation of the ADA espoused by [Defendant], which would render the legislation intended to emancipate the disabled from the bonds of isolation and segregation obsolete when its objective is increasingly within reach."

## COMMON PARLANCE

Defendant points to a dictionary definition of "place" as proof that "place" can mean only a physical space. But dictionary definitions of place vary and often bear no relationship to physical locations. See e.g., Webster's Encyclopedic Unabridged Dictionary of the English Language 1478 (1996) (including entries such as "position, situation, or circumstances"). At least one dictionary also describes a website as a "*place* on the Internet with one or more pages of information about a subject." (Definition of website from the Cambridge Academic Content Dictionary © Cambridge University Press  https://dictionary.cambridge.org/us/dictionary/english/website)  (emphasis added). Resort to the dictionary, at best, perpetuates the debate here. See *Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 418 (1992) ("The existence of alternative dictionary definitions of the word … each making some sense under the statute, itself indicates that the statute is open to interpretation.").

Plaintiffs respectfully submit that the more instructive source for understanding the meaning of the statutory language at issue here is its everyday usage. See e.g., *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2006) (favoring how a word is "more frequently used and understood in common parlance" than its array of dictionary definitions); see also *Muscarello v. United States*, 524 U.S. 125, 127-33 (1998) (examining not just dictionary definitions of the term "carry," but also its usage in popular literature and newspapers).

The everyday usage of "place" confirms Plaintiffs' reading of the ADA to be correct. The Internet is routinely described as a "place," and it is often ascribed physical attributes. E.g., Shani Else, Note, *Courts Must Welcome the Reality of the Modern World: Cyberspace is a Place Under the Americans with Disabilities Act*, 65 Wash. & Lee L. Rev. 1121, 1145-48 (2008). As a society, we speak of email "addresses," discussions on Internet chat "rooms," posts on Facebook "walls," and shopping at online "shops" and "stores." The Internet as a whole is referred to as "cyberspace." Newspapers and other media habitually refer to websites as "places" and have done so for quite some time. The following samples stand for what are undoubtedly thousands of others like them:

- "The only other *place* I can look is on the insurer's website,"[1]

- "Something else I've grown to love about the website is much less common: It's a wonderful *place* to shop,"[2]

---

[1] Paul Downs, Help Needed on Health Plans, N.Y. Times, Jan. 9, 2014, at B5 (Emphasis added).
[2] Jenna Worthman, A Bazaar Where You Least Expect It, N.Y. Times, March 9, 2014 at BU4 (emphasis added).

- "The club's Web Site includes a *place* to donate to a fire-relief fund and a wish list of items ranging from audio and visual equipment to old skis,"[3]

- "The Internet is not just a single *place*, it is lots of places."[4]

## <u>LEGISLATIVE HISTORY</u>

To the extent there is any uncertainty as to the application of principles of statutory interpretation to the issue here, the Court should ground its decision-making in the legislative history of the ADA. *United States v. Alpers*, 338 U.S. 680, 682 (1950) (instructing that the rules on statutory construction cannot be employed to "obscure and defeat the intent and purpose of Congress"); *United State v. Kennedy*, 233 F3d 157, 161 n.4 (2nd Cir. 2000) (same); see also *United States v. Pacione*, 738 F.2d 567, 570 (2nd Cir.1984) (stating that a court should consult legislative history to resolve any conflict between principles of statutory construction).

"The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (applying the ADA to state prisoners because of its "unambiguous statutory text" while rejecting petitioners' argument that the ADA does not apply to state prisoners because Congress did not "envision that the ADA would be applied to state prisoners"); *see also Enyart v. National Conference of Bar Examiners, Inc.,* 630 F.3d 1153, 1163 (9th Cir. 2011)

---

[3] Green Mountain Club fire, Burlington Free Press, March 14, 2004 (emphasis added).
[4] Bloomberg TV, Interview of Trip Adler, 2014 WLNR 14693885 (May 30, 2014).

("[A]ssistive technology is not frozen in time: as technology advances, ... accommodations should advance as well.")

The ADA's legislative history confirms that Congress intended the list of exemplars in the definition of places of public accommodation to be "construed liberally" and in harmony with the ADA's broad purpose. S. Rep. No. 101-116, 59 (1990) (emphasis added) *("[W]ithin each of these categories, the legislation only lists a few examples and then, in most cases, adds the phrase 'other similar' entities*. The Committee intends that the 'other similar' terminology should be construed liberally consistent with the intent of the legislation …"); see also H.R. rep. 101-485 (III) at 54, reprinted in 1990 U.S.C.C.A.N. at 477 (same).

Congress specifically intended that the ADA's broad mandate for providing access to public accommodations apply to emerging technologies. "[T]he Committee intends that the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times." *Id*. at 108, reprinted in 1990 U.S.C.C.A.N. at 391 (cited in Netflix, 869 F. Supp. 2d at 200-01). As Congress put it, "technological advances can be expected to further enhance options for making meaningful and effective opportunities available to individuals with disabilities." *Id*.

Indeed, Congress specifically identified areas where expanding technology would be subject to the ADA. *Id*.; see also H.R. Conf. Rep. No. 101-596 at 67-68 (1990), reprinted in 1990 U.S.C.C.A.N. 565, 576-77 (recognizing that "[i]n the future, new technology, such

as speech-to-text services, may require other forms of direct access [to 911 emergency services for the deaf]").

*Nat'l Fed'n of the Blind v. Scribd Inc.,* 97 F. Supp. 3d 565, 575 (D. Vt. 2015) is instructive in this regard. In *Scribd Inc.,* the Court held that a website must comply with the ADA if it falls within any of the general categories of public accommodations listed in the ADA, whether it has physical locations or not, reasoning as follows:

> The liberal approach is confirmed by the Committee Reports …The goal is "full participation in and access to all aspects of society." H.R. Rep. 101-485 (II), at 35 (1990). Id. (quoting Statement of John Thornburgh, Att'y Gen. of the United States before H. Subcomm. on Civil and Constitutional Rights, Ser. No. 58, October 11, 1989, at 192) … The Committee Reports also make it clear that Congress intend that the statute be responsive to changes in technology, at least with respect to available accommodations. H.R. rep. 101-485(II), at 108 (1990) ("The Committee intends that the types of accommodation and services provided to individuals with disabilities … should keep pace with the rapidly changing technology of the times.").

*Scribd* at 572 (internal quotation marks omitted). The *Scribd* court concluded that "it seems likely that making websites compatible with screen reader software is the kind of advanced technology Congress was envisioning." *Id*.

## THE UNITED STATES SUPREME COURT

In *South Dakota v. Wayfair, Inc.,* 138 S. Ct. 2080 (2018), the United States Supreme Court made it clear that it will not read an artificial and antiquated distinction between businesses that have a physical presence and those that do not into a statutory scheme that does not expressly require the distinction.

*Murphy v. Bob Cochran Motors, Inc*., No. 1:19-cv-00239-RAL-SPB, 2020 U.S. Dist. LEXIS 139887, at *20 n.5 (W.D. Pa. Aug. 4, 2020) made clear the significance of *Wayfair* to the question now before the Court:

> The Supreme Court's decision in *South Dakota v. Wayfair*, 138 S. Ct. 2080, 2091, 201 L. Ed. 2d 403 (2018) is also potentially instructive. There the Court overruled an earlier precedent which held that states could not require out-of-state retailers to collect and remit sales tax on purchases made within the state unless the retailer "maintained a physical presence" in that state. Id. (overruling *Quill Corp. v. North Dakota*, 504 U.S. 298, 301, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992)). In doing so, the Supreme Court threw significant shade on the "physical presence rule," finding it was an "*arbitrary, formalistic distinction*." Id. at 2092. The Court noted that it wanted instead to create a rule "appropriate to the twenty-first century, not the nineteenth." Id. (quotation omitted). Specifically relevant to the issue in this case, the Court noted that "[m]odern e-commerce does not align analytically with a test that relied on the sort of physical presence defined by *Quill*," and that the physical presence rule "simply makes no sense." Id. at 2094-95. . . . Obviously, *Wayfair* was a tax case. But in Wayfair, the Supreme Court strongly intimates that *artificial distinctions between "virtual" and "physical" commerce originally created during the early years of the internet are no longer tenable*.

*Bob Cochran*, 2020 U.S. Dist. LEXIS 139887, at *20 n.5. (emphasis added).

## **FEDERAL DISTRICT COURTS**

There is significant momentum from district courts across the nation supporting an interpretation of the ADA that mandates compliance, regardless of whether the website is associated with any physical location. See e.g., in addition to those district court cases cited above, *Wright v. Thread Experiment, LLC*, No. 1:19-cv-01423-SEB-TAB (S.D. Ind. Jan 22, 2021) (an excellent opinion considering and thoughtfully analyzing the pertinent authority by then Senior District Judge, Jack B. Weinstein); *Markett v. Five Guys Enterprises LLC,* 1:17–cv–00788–KBF, ECF No. 33, Order on Def.'s Mot. to Dismiss (S.D.N.Y. July 21, 2017) ("[T]he text and purposes of the ADA, as well as the breadth of

federal appellate decisions, suggest that defendant's website is covered under the ADA, either as its own place of public accommodation or as a result of its close relationship as a service of defendant's restaurants, which indisputably are public accommodation under the statute."); *Nat'l Ass'n of the Deaf v. Netflix, Inc.,* 869 F.Supp.2d 196, 201–02 (D. Mass. 2012):

> ADA covers the services 'of' a public accommodation, not services "at" or "in" a public accommodation. 42 U.S.C. § 12182(a). This distinction is crucial. Consequently, while the home is not itself a place of public accommodation, entities that provide services in the home may qualify as place of public accommodation. Under Defendant's reading of the statute, many businesses that provide services to a customer's home—such as plumbers, pizza delivery services, or moving companies—would be exempt from the ADA. The First Circuit held in *Carparts* that such an interpretation is absurd. Under the *Carparts* decision, the Watch Instantly web site is a place of public accommodation and Defendant may not discriminate in the provision of the services of that public accommodation — streaming video—even if those services are accessed exclusively in the home.

 (citations omitted);

*Del-Orden v. Bonobos, Inc.*, 2017 WL 6547902, at *1 (S.D.N.Y. Dec. 20, 2017) (adopting approach of modern case law "that commercial websites qualify as 'public accommodations' within the meaning of the ADA, such that the ADA's protections extend to blind persons who claim discriminatory access to such websites."); and *Gniewkowski v. Lettuce Entertain You Enterprises, Inc*, 251 F. Supp. 3d 908, 915 (W.D. Pa. 2017).

## **PLAINTIFFS' MHRA STATE LAW CLAIM**

The Minnesota Human Rights Act (MHRA) defines a "place of public accommodation" much more broadly than the ADA does. For purposes of the MHRA,

> "Place of public accommodation means a *business*, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or

not, *whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public."*

Minn. Stat. 363A.03, Subd., 34. (emphasis added)

The language used by defendants to avoid the application of the ADA to their websites is not found in the MHRA; and there is no dispute that Defendant is a business whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public. There is therefore no dispute that the MHRA applies to online-only businesses like the Defendants.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Plaintiffs respectfully request that the Court deny Defendant's motion in its entirety.

**THRONDSET MICHENFELDER, LLC**

Dated: August 20, 2024            By: *<u>/s/Patrick W. Michenfelder</u>*
                                  Patrick W. Michenfelder (#024207X)
                                  Jason D. Gustafson (#0403297)
                                  80 South 8th Street, Suite 900
                                  Minneapolis, MN 55402
                                  Tel: (763) 515-6110
                                  pat@throndsetlaw.com
                                  jason@throndsetlaw.com
                                  *Attorneys for Plaintiff*