UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| CLARENCE FROST ET AL., | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| v. | ) CASE NO:  0:24-cv-00950-KMM-LIB |
| | ) |
| LION BRAND YARN COMPANY, | ) Judge Katherine M. Menendez |
| | ) |
| | ) Magistrate Judge Leo I. Brisbois |
|     **Defendant.** | ) |

## REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

This lawsuit concerns whether Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 et seq. ("Title III") and the Minnesota Human Rights Act ("MHRA"), Minn. Stats. 363A.11, require Defendant Lion Brand Yarn Company ("Lion Brand") to make changes to its website, https://www.lionbrand.com/ (the "Website") so that it is "accessible" to individuals with visual disabilities.

As set forth in its Memorandum in Support of Motion to Dismiss ("Memo in Support"), the plain language of Title III refers solely to physical structures and the plurality of courts that have addressed this issue have held that the plain language of the statute controls and that until this law is amended, stand-alone websites are not subject to Title III.

In support of their position that "Defendant violated the ADA by failing to make its website compatible with and accessible by screen reader programs", Plaintiffs rely on briefs filed by the Department of Justice ("DOJ") in courts that have not adopted the DOJ's position, three cases from outside of the Eighth Circuit involving insurance underwriting,

1

and random articles from recent times wherein people who are not members of Congress use the word "place" to refer to a website.

As set forth herein, the DOJ's position is not binding on this Court, nor are the cited cases. Moreover, these cases are distinguishable from the present matter as none of them held that websites are places of public accommodation or that business owners must alter their websites to interact with screen readers. Importantly, the rules of statutory construction demand a reading of the word "place" to refer to a physical space and not to a website, as the word "website" did not appear in any dictionary until 1993—three years after Congress enacted Title III. The plain language of the statute, the case law, and logic all demand a holding that Title III does not apply to the Website.

## LAW AND ARGUMENT

### The Plain Language of Title III

In their Opposition to Lion Brand's Motion to Dismiss, Plaintiffs argue that Lion Brand "violated the ADA by failing to make its website compatible with and accessible by screen reader programs."[1] Opp. to Mot. to Dismiss (Docket No. 29), p. 8. Plaintiffs claim that Lion Brand is a sales establishment, as identified in 42 USC § 12181(7). Plaintiffs incorrectly claim that Lion Brand violated Title III or that Lion Brand is a "sales establishment." The Fifth Circuit has directly addressed what qualifies as a "sales

---

[1] Plaintiffs make another reference to screen reader software, erroneously implying that the Website is obligated to provide such auxiliary aids to the public. Screen reader software is not installed on a website; it is installed on a disabled individual's computer or on an electronic device used in an in-person setting, such as a kiosk or tablet. Owners and operators of websites cannot provide screen reader software to the public.

establishment" and a website is not one. In *Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530, 534-535 (5th Cir. 2016), the Fifth Circuit examined the provision of Title III regarding "other sales establishments" as follows:

> Under the principle of *noscitur a sociis*, "a word is known by the company it keeps." Similarly, the *canon of ejusdem generis* instructs that "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed."…The relevant portion of [42 U.S.C. § 12181(7)(E)] uses the term 'sales establishment' following a list of retailers occupying ***physical stores.***
> \*\*\*
>
> Other courts, including the Third, Sixth, and Ninth Circuits, have recognized that "[e]very term listed in § 12181(7) . . . is a ***physical place*** open to public access." "They are ***actual, physical places*** where goods or services are open to the public, and places where the public gets those goods or services."
> \*\*\*
>
> The common meaning of the term "establishment" also supports [defendant's] view that a "sales establishment" includes not only a business but also the ***physical space*** that it occupies. Merriam-Webster's Collegiate Dictionary defines "establishment" as "a place of business or residence with its furnishings and staff." It relevantly defines "place" as "a ***building*** or locality used for a special purpose." Webster's Third New International Dictionary defines "establishment" as a "sizable place of business or residence together with all the things that are an essential part of it (as grounds, furniture, fixtures, retinue, employees)." It too defines "place" as "a ***building*** or locality used for a special purpose." The American Heritage Dictionary of the English Language defines "establishment" as "[a] place of business, including the possessions and employees."…Finally, the Supreme Court has recognized that the term "establishment" is "normally used in business and in government . . . as meaning a ***distinct physical place*** of business."[2]
>
> *Id.* at 534-535 (emphasis added).

---

[2] *A. H. Phillips, Inc. v. Walling*, 324 U.S. 490, 496 (1945) ("Congress used the word 'establishment' as it is normally used in business and in government -- as meaning a distinct ***physical place of business***") (emphasis added).

Thus, the Third, Fifth, Sixth, Ninth, and Eleventh Circuits have examined the plain language of Title III and have held that it applies solely to **physical buildings.** This Court should follow these courts' leads and hold likewise that a "place" as used by Congress is a physical location and **not** a stand-alone website.

It is without question that determining the meaning of the word "place" as used by Congress in Title III is a key issue. The Eighth Circuit has held that the goal of statutory interpretation is to give effect to the intent of Congress and that statutory interpretation begins with the plain language of the statute. *Estate of Farnam v. C.I.R.*, 583 F.3d 581, 584 (8th Cir. 2009); *Sierra Club v. Otter Tail Power Co.,* 615 F.3d 1008, 1014-15, 1018 (8th Cir. 2010) (noting that the court begins its inquiry with the language of the statute and basing its conclusion on the court's interpretation of the plain language of the statute); *Estate of Farnam*, 583 F.3d at 584 (the first step in giving effect to congressional intent "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997))). If the Court finds the language of the statute unambiguous, the Court need not resort to secondary canons of statutory interpretation. *Hays v. Commun. Techs., Inc.,* 753 F. Supp. 2d 891, 899 (8th Cir. 2010) (citing *Estate of Farnnam*, 583 F.3d at 584).

Importantly, the Eighth Circuit has also held that "[a]s usual, our job is to interpret the words consistent with their ordinary meaning . . . *at the time Congress enacted the statute*.'" *Sanzone v. Mercy Health*, 954 F.3d 1031, 1040 (8th Cir. 2020) (emphasis added) (quoting *Wis. Cent. Ltd. v. United States,* 138 S. Ct. 2067, 2070, 201 L. Ed. 2d 490 (2018)

4

(alteration in original) (quoting *Perrin v. United States*, 444 U.S. 37, 42, 100 S. Ct. 311, 62 L. Ed. 2d 199 (1979))).  The court's ordinary meaning inquiry begins "with the simple dictionary definition *from the time of the statute's enactment*." *Id.* (emphasis added) (citing *Wis. Cent.*, 138 S. Ct. at 2070-71 (using dictionaries from 1942 and 1933 to interpret "money" in an act adopted in 1937)).  The fact that current contributors to the New York Times describe websites as "places" is inapposite and does not aid in this Court's determination of Congress' intent when it used the word "place" to describe the location where discrimination is prohibited.  Rather, the crucial question is what the word "place" meant in 1990.  As set forth in Lion Brand's Memo in Support, "place" means physical structure.

There can be no doubt that at the time Congress enacted Title III—1990—it did not intend the word "place" to mean "website", as "website" was not defined by Merriam-Webster until 1993.  Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/website   Thus, "place" refers to a physical location and a "place of public accommodation" that must be accessible[3] pursuant to Title III is the *physical* facility that houses a public accommodation—not a website.[4]

### **The Legislative History Does Not Indicate That Congress Intended "Place" to Include Websites**

As the plain language of the statute is clear and unambiguous, there is no need to

---

[3] Again, there are no legal standards regarding the accessibility of websites.  It defies credulity that Lion Brand can be held to violate standards that do not exist.

[4] Notably, Plaintiffs cite no standards that it claims that Lion Brand must meet with respect to the Website, likely because no such standards exist.

look to the legislative history of the statute; however, if the Court were to do so, the Court would not find any intent to include websites in the list of "public accommodations". Plaintiffs' citations to legislative history do not show that Congress intended the categories delineated in 42 U.S.C. §12181(7) should expand; rather, the commentary explicitly refers to auxiliary aids—the "accommodations" and "services" provided to individuals…such as "speech-to-text services." Opp. To Motion to Dismiss, (Docket No. 29), pp. 20-21. As noted above, auxiliary aids are not at issue here—the citation is inapposite to Plaintiffs' case.

Plaintiffs also cite S. Rep. No. 101-116, 59 (1990) for the proposition that "the legislation only lists a few examples and then, in most cases, adds the phrase 'other similar' entities. The Committee intends that the 'other similar' terminology should be construed liberally consistent with the intent of the legislation" in an attempt to claim that Congress intended the definition of place of public accommodation to be construed to include website. This attempt fails as **the statute does not ever use the phrase "other similar" when listing public accommodations**:

> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
>
> (B) a restaurant, bar, or other establishment serving food or drink;
>
> (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. §12181(7).

Moreover, even if each category included the phrase "other similar" entities (which it does not), there is no indication that a website would be an "other similar" entity. Indeed, a website is vastly different than any of the physical structures listed above. Plaintiffs'

attempt to show that Congress intended the definition of place of public accommodation to change with the times without amendment falls flat.

Notably, Congress amended Title I of the ADA in 2008 in order to clarify the definition of "disability" in response to a number of court decisions that had interpreted the statute narrowly. At this point in time, websites were common, and many courts had issued decisions holding that Title III did not apply to stand-alone websites. See, e.g., *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1023 (N.D. Cal. 2012), aff'd, 600 F. App'x 508, 509 (9th Cir. 2015) (holding that Netflix's website is unconnected to any physical, concrete retail establishment and is therefore not a public accommodation under the ADA); *Access Now, Inc. v. Southwest Airlines Co.,* 227 F. Supp. 2d 1312, 13218-19 (S.D. Fla. 2002), aff'd, 385 F.3d 1324, 1327-28 (11th Cir. 2004) (finding plaintiff failed to establish a nexus between southwest.com and any restriction on the full enjoyment of a physical, concrete place of public accommodation). Still, Congress chose not to amend Title III of the ADA to explicitly expand its application beyond physical structures at this time. Had Congress intended the word "place" to encompass cyberspace, as opposed to the original meaning the word had in 1990 (which could not have included an internet location), Congress could have amended the list of physical locations in 42 U.S.C. §12181(7) to include websites or expanded its reach to include businesses in general with whom the public interacts. Congress' inaction in this regard speaks volumes as to its intention that Title III only applies to physical places.

Finally, in arguing that the MHRA applies to the Website, Plaintiffs admit that the MHRA's definition of "place of public accommodation" is "much more broad[]" than that

8

of Title III in that it includes "*businesses* . . .whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public."  Opp. To MTD, p. 23 Docket No. 29) (emphasis in Pls' Br.).  Had Congress intended Title III to encompass websites, it would have used this language. However, it did not. Thus, the plain language of Title III does not apply to stand-alone websites such as the Website, and Plaintiffs' claims must be dismissed.

## The Cases Plaintiffs Cite Are Distinguishable

In their Opposition to Lion Brand's Motion to Dismiss, Plaintiffs concede that the plurality of courts that have addressed this issue have held that Title III does not apply to stand-alone websites based upon the text of the ADA, and then discuss cases from three Courts of Appeals that involve insurance companies' ability to refuse to see disabled individuals insurance policies.  None of these cases hold, explicitly or implicitly, that Title III applies to stand-alone websites.  Lion Brand discusses each in turn.

In *Doe v. Mutual of Omaha Insurance Co*., 179 F.3d 557 (7th Cir. 1999), the defendant insurer appealed a judgment of the United States District Court for the Northern District of Illinois, Eastern Division, which held that the AIDS caps in two of its health insurance policies violated Title III.  The Seventh Circuit reversed the judgment for the plaintiffs, holding that Title III of the ADA does not regulate the content of the products or services sold in places of public accommodation, and that there was a difference between the refusal to sell a policy to a person with AIDS and offering insurance policies that contain caps.

While the *Doe* court does, in *dicta*, state that "the core meaning of [Section 302(a) of Title III], plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do," Plaintiffs omit the rest of the quote, which provides necessary context. *Id*. at 558-559 (internal citations omitted). The remainder of the quote is that "*the owner or operator of, say, a camera store can neither bar the door to the disabled nor let them in but then refuse to sell its cameras to them on the same terms as to other customers*." *Id.* at 559 (emphasis added).[5] Indeed, the entire opinion is about whether Title III applies to inventory—and the *Doe* court concluded that "Section 302(a) does not require a seller to alter his product to make it equally valuable to the disabled and to the nondisabled, even if the product is insurance." *Id.* at 563. This is the holding of the case. The fact that the word "Web site" is used a single time in dicta does not in any way support Plaintiffs' position that that an online-only retailer must comply with non-existent standards in building its website to ensure that a visually-impaired individual can navigate the website without assistance.

---

[5] *Morgan v. Joint Admin. Bd.,* 268 F.3d 456, 459 (7th Cir. 2001), cited by Plaintiffs, also dealt with the refusal to sell intangible products (in this case, disability retirement plans). The quote in Plaintiffs' brief is also dicta, as the court held that retirement plan was not offered to the public; therefore, the plaintiffs' public accommodations claim failed. The court did not address whether a website must be "accessible" and if so, what standards with which a website owner must comply.

Similarly, in *Pallozzi v. Allstate Life Ins. Co.,* 198 F.3d 28 (2d Cir. 1999), the plaintiffs alleged that the defendant insurance company discriminated against plaintiffs on the basis of their mental disabilities by refusing to issue them a joint life insurance policies in violation of Title III.  The District Court found that because the plaintiffs had "not alleged facts from which the Court can draw a favorable inference that their denial might not have been based on sound actuarial principles" and "failed to provide factual support for their contention that the Defendant used the 'safe harbor' provision [of Section 501(c) of the ADA] as a subterfuge," dismissal was warranted.  The Second Circuit disagreed, holding that "Title III does regulate the sale of insurance policies in insurance offices, subject to the limitations of the safe harbor provision in Section 501(c) of Title V." *Id.* at 33.  Because the court found that the statutory text "*unambiguously covers insurance underwriting in at least some circumstances*", the court did not need to consider Plaintiffs' arguments that the ADA's legislative history and the interpretive guidelines issued by the Department of Justice confirm this interpretation.  *Id.* (emphasis added).  Thus, in *Pallozzi,* the court was opining on insurance underwriting, not website accessibility.  It is quite a stretch to extrapolate the holding in *Pallozzi* to encompass the Website.

Finally, in *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Ass'n of New England, Inc*., 37 F.3d 12 (1st Cir. 1994), the plaintiff, an AIDS victim, and his employer brought an action against defendant health plan, alleging that a lifetime cap on health benefits for individuals with AIDS instituted by the health plan represented illegal discrimination on the basis of a disability. The United States District Court for the District of New Hampshire dismissed the claims under Fed. R. Civ. P. 12(b)(6), and they appealed.

While the First Circuit interpreted Title III's prohibition on disability discrimination as not limited to service providers with physical structures, it did not hold that Title III applies to websites and it did not hold that service providers such as the defendant who offered services over the phone had to alter their phone lines so that they were accessible to individuals with disabilities. Rather, the *Carparts* Court merely held that this insurance company could not deny coverage to an individual due to his health condition. *Id.* The case was not about accessibility, but instead was about a refusal to provide services to a disabled individual. *Id.* at 20 ("It would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not.") This case does not support Plaintiffs' claim that websites are subject to the accessibility requirements of Title III. *Carparts* merely stands for the proposition that public accommodations cannot refuse service to individuals with disabilities. It does not require Lion Brand to remodel the Website.

The quotes Plaintiffs include in their briefs, without more, are convenient sound bites that do not accurately represent the state of the law. These cases do not apply to the Website, and if they applied to Lion Brand at all, they merely stand for the proposition that Lion Brand may not refuse to sell its products to an individual with a disability. Nothing contained in these decisions imposes a requirement on Lion Brand or any other online-only retailer to modify their websites. Further, as the Third and Sixth Circuits have explained, the interpretations of the First, Second, and Seventh Circuits ignores the doctrine of *noscitur a sociis*. *Magee*, 833 F.3d at 534 (citing *Ford v. Schering-Plough Corp.*, 145 F.3d

12

601, 614 (3d Cir. 1998); *Parker v. Metro. Life Ins. Co.,* 121 F.3d 1006, 1014 (6th Cir. 1997).

Finally, these cases are not binding on this Court, nor is the fact that the DOJ has filed two briefs[6] in support of the proposition that Title III applies to stand-alone websites or settled a singular claim on this topic. The DOJ's Guidance is similarly meaningless. The DOJ has the power to enact actual rules and regulations regarding Title III and applying it to websites, but it has not. Its silence on this topic speaks volumes. A website cannot be held liable for failing to abide by standards that have not been articulated.

## The MHRA Claims Should Be Dismissed for Lack of Jurisdiction

Regarding the MHRA claims, it is a basic tenet of laws that supplemental jurisdiction only applies to a "civil action of which the district courts have original jurisdiction." 28 U.S.C. § 1367(a). Therefore, before a district court asks whether it can exercise supplemental jurisdiction over some claims in an action, it must first determine that it has original jurisdiction over the civil action within the meaning of § 1367(a); in other words, it must have original jurisdiction over at least one claim in the complaint. *Exxon Mobil Corp. v. Allapattah Services, Inc*., 545 U.S. 546, 162 L. Ed. 2d 502, 125 S. Ct. 2611, 2620-21 (2005). If all of the claims in a complaint that have original jurisdiction in federal court are dismissed, supplemental jurisdiction no longer exists, and the Court must dismiss the remaining state law claims without prejudice.

## CONCLUSION

---

[6] The courts in which the DOJ filed its briefs have not held that stand-alone websites are subject to Title III of the ADA.

Because Title III does not apply to stand-alone websites such as https://www.lionbrand.com/, Plaintiffs have failed to state a claim upon which relief may be granted. As subject-matter jurisdiction will be lacking in this Court once these claims are dismissed, Plaintiffs' MHRA claims must also be dismissed. As such, Lion Brand respectfully requests that the Court dismiss Plaintiffs' Amended Complaint in its entirety.

Respectfully submitted,

*/s/ Jennifer S. Rusie*
Jennifer Zwilling, MN Bar No. 0389153
Jackson Lewis P.C.
150 South Fifth Street, Suite 3500
Minneapolis, MN 55402
Telephone: (612) 359-1766
jennifer.zwilling@jacksonlewis.com

Jennifer S. Rusie (admitted pro hac vice)
Jackson Lewis, P.C.
611 Commerce Street, Suite 2803
Nashville, TN  37203
Telephone: (615) 565-1661
jennifer.rusie@jacksonlewis.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2024, the foregoing was served via the Court's ECF system upon the following:

    **Jason D Gustafson**
    Throndset & Michenfelder Law Office LLC
    One Central Avenue West, Suite 101
    St. Michael, MN 55330
    Phone: 763-515-6110
    Email: jason@throndsetlaw.com

    **Patrick W Michenfelder**
    Throndset Michenfelder Law Office, LLC
    222 South Ninth Street, Ste 1600
    Minneapolis, MN 55402
    Phone: 763-515-6110
    Email: pat@throndsetlaw.com

    */s/ Jennifer S. Rusie*
    Jennifer S. Rusie

4872-5542-6274, v. 1