## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Clarence Frost and Tammy Frost, *individually and on behalf of all others similarly situated*, | No. 24-cv-950 (KMM/LIB) |
| Plaintiffs, | |
| | **ORDER** |
| v. | |
| Lion Brand Yarn Company, | |
| Defendant. | |

This matter is before the Court on Defendant Lion Brand Yarn Company's motion to dismiss the Plaintiffs' Amended Complaint for failure to state a claim. Def.'s Mot. (Doc. 24). For the reasons that follow, the motion is denied.

### BACKGROUND

Because this case is before the Court on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court accepts the factual allegations in the Amended Complaint as true for purposes of this Order. Plaintiffs Clarence Frost and Tammy Frost are legally blind. Am. Compl. ¶ 20 (Doc. 23). Ms. Frost does not have eyes and is completely blind. *Id.* ¶ 31. Mr. Frost has severe low vision. *Id.* The Frosts depend on the use of screen reader technology to navigate the internet. *Id.*

Lion Brand Yarn Company ("Lion Brand") is the oldest producer of knitting and craft yarn in the United States. *Id.* ¶¶ 22, 24. Lion Brand first launched a website for its business in 1996. *Id.* ¶ 23. In February 2024, internet users in the United States visited Lion

Brand's website 1.13 million times. *Id.* Lion Brand makes its products available on its website to those wishing to browse, research, or shop online. *Id.* ¶ 24.

Tammy Frost enjoys knitting. *Id.* ¶ 29. In the past, Ms. Frost purchased Lion Brand's yarn from retail stores, like Joann Fabrics. *Id.* ¶ 28. Ms. Frost has also visited the Lion Brand website several times to look for yarn she could use in her knitting hobby. *Id.* ¶ 29. However, at least three times that she visited Lion Brand's website, the site conveyed confusing, disorienting, and non-sensical information to Ms. Frost's screen reader. *Id.* ¶ 30. Whether on their own or together, the Frosts cannot navigate and understand Lion Brand's website. *Id.* ¶ 31. Nor can they complete an online purchase from the website without assistance. *Id.*

Automated and manual audits of the Lion Brand website confirmed the Frosts' description of their user experience of the site and the site's limited functionality with screen reader technology. *Id.* ¶ 32. For example:

> a. Defendant's Website fails to alert screen readers to pop-up window content such as a "Subscribe and Save $15% on Your Next Order" opportunity and instead conveys non-sensical, confusing, and disorienting information. Instead, screen reader technology narrates the content of the Website's underlying page. As a result, pop-up content Defendant deems sufficiently important to convey to its sighted Website visitors is completely unavailable to screen reader users;
>
> b. The Website does not provide sufficient screen reader-accessible text equivalent for important non-text image(s) such as various color swatch choices of yarn for sale. People who are blind will not be able to understand the content and purpose of images, such as pictures, illustrations, and charts when no text alternative is

2

provided. Text alternatives convey the purpose of an image, including pictures, illustrations, charts, etc.;

c. Defendant's Website has inaccessible unordered drop-down menu lists which are unrecognized by screen reader technology. Users who depend on screen reader technology should know if and when unordered lists are presented and available for viewing; and

d. Defendant's Website conveys information visually and via color as the only means of conveying information and without audible narration, including sales prices that have been reduced from $5.99 to $4.19" making the information unavailable to screen reader users.

*Id.* ¶ 32.

Despite these issues, the Frosts intend to access Lion Brand's website in the future to find and purchase Lion Brand's products. *Id.* ¶ 33. However, for those with vision-related disabilities, Lion Brand's website is not accessible to the same degree it is for individuals who do not have similar vision impairments. *Id.* ¶ 34.

The Frosts raise disability-discrimination claims under both federal and state law. They assert their own claims and claims on behalf of a putative class of Lion Brand's website's users who have a low vision disability and require screen reader aids to navigate the internet. In their first cause of action, the Frosts allege that Lion Brand violates Title III of the ADA by failing to provide its website's content and services in a manner that is compatible with screen reading aids. *Id.* ¶¶ 56–69. The Frosts specifically assert that Lion Brand's website is a place of public accommodation within the meaning of 42 U.S.C. § 12182(a). *Id.* ¶¶ 25, 56. In their second cause of action, the Frosts assert that Lion Brand's website violates the Minnesota Human Rights Act's prohibition on disability

discrimination in the same ways. *Id.* ¶¶ 70–78. The Frosts seek certification of a class, a declaratory judgment, a permanent injunction, damages, and costs and attorneys' fees. *Id.*, Prayer for Relief.

## DISCUSSION

Lion Brand's motion to dismiss raises a straightforward legal issue. Lion Brand contends that the Amended Complaint fails to state a claim for a violation of Title III of the ADA because that statute only applies to "places of public accommodation," and a website is not a place of public accommodation. Def.'s Mem. 1, 4–12 (Doc. 25). At least for purposes of this motion, Lion Brand does not dispute that the Frosts have alleged that its website is inaccessible for those who require screen reading aids. In addition to arguing that the Court should dismiss the Title III claim, Lion Brand argues that if the Title III claim fails, the Court should decline to exercise supplemental jurisdiction over the MHRA claim and dismiss it without prejudice. *Id.* at 12.

## I.   Legal Standards

### A.   Fed. R. Civ. P. 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of detailed factual allegations in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying

4

this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *see also Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019).

### B. Statutory Interpretation

The issue presented by Lion Brand's motion is one of statutory interpretation. That task "begins with the statute's plain language," and when "the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end." *Union Pac. RR Co. v. Surface Transp. Bd.*, 113 F.4th 823, 833 (8th Cir. 2024) (quoting *United States v. Lester*, 92 F.4th 740, 742 (8th Cir. 2024)). First, courts must "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *LaCurtis v. Express Med. Transps., Inc.*, 856 F.3d 571, 578 (8th Cir. 2017) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). To decide whether the statutory language is plain or ambiguous, courts refer "to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (quoting *Robinson*, 519 U.S. at 341); *see also King v. Burwell*, 576 U.S. 473, 486 (2015) ("But oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."). The court engaging in this task uses the ordinary meaning of terms in the statute. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019).

5

If the statute's language lends itself to more than one reasonable interpretation, it is ambiguous, and courts may examine other sources to determine legislative intent. *Stanley v. Cottrell, Inc.*, 784 F.3d 466 (8th Cir. 2015) (citing *Owner-Operator Indep. Drivers Ass'n v. Supervalu, Inc.*, 651 F.3d 857, 863 (8th Cir. 2011)). However, "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *King*, 576 U.S. at 492 (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)).

## II.    Title III of the ADA and Places of Public Accommodation

### A. The Purpose and Language of the ADA

"Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). Among other things, Congress found that "discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services. . . ." 42 U.S.C. § 12101(a)(3). The ADA's purpose includes the aim "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities. . . ." 42 U.S.C. § 12101(b)(1). "After thoroughly investigating the problem, Congress concluded that there was a 'compelling need' for a 'clear and comprehensive national mandate' to eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of

American life.'" *PGA Tour*, 532 U.S. at 675 (quoting S. Rep. No. 101–116, p. 20 (1989);

H.R. Rep. No. 101–485, pt. 2, p. 50 (1990), U.S. Code Cong. & Admin. News 1990, pt. 2,

pp. 303, 332).

In relevant part, the ADA provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). The elements of a disability discrimination claim under Title III

include that: (1) the plaintiff is disabled, (2) the defendant owns, leases or operates a place

of public accommodation, (3) the defendant engaged in conduct adverse to the plaintiff

because of the plaintiff's disability, and (4) the defendant failed or refused to provide the

plaintiff a reasonable accommodation for the plaintiff's disability. *Koester v. Young Men's*

*Christian Ass'n of Greater St. Louis*, 855 F.3d 908, 910 (8th Cir. 2017) (quoting *Amir v.*

*St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir. 1999)).

Title III of the ADA provides a broad definition of "public accommodation." 42

U.S.C. § 12181(7). For example, the list of public accommodations includes hotels,

restaurants and bars, movie theaters, convention centers, bakeries, service establishments,

public transportation stations, places of public display or collection, places of recreation,

places of education, and social service establishments. *Id.* § 12181(7)(A)–(L). These "12

extensive categories of facilities . . . are to be construed liberally to afford people with

disabilities equal access to the wide variety of establishments available to the non-

disabled." *Bauer v. Muscular Dystrophy Ass'n, Inc.*, 268 F. Supp. 2d 1281, 1289–90 (D. Kan. 2003) (citing *PGA Tour*, 532 U.S. at 666–67).

However, websites are not expressly included in the list of public accommodations referred to in the statutory definition. Consequently, Lion Brand argues that Title III of the ADA does not apply to its website.

### B. Circuit Split

The parties agree that the Eighth Circuit has not resolved the issue now before this Court. They also agree that there is a split among the Eighth Circuit's sister circuits on the broad question of whether a place of public accommodation must be a physical structure.

Some courts have held that Title III of the ADA unambiguously applies only to physical structures. *Ford v. Schering-Plough Corp.*, 145 F.3d 601 (3d Cir. 1998); *Peoples v. Discover Fin. Servs., Inc.*, 387 F. App'x 179 (3d Cir. 2010); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006 (6th Cir. 1997) (en banc); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104 (9th Cir. 2000).[1] In *Parker*, *Ford*, and *Weyer*, the plaintiffs argued that Title III's prohibition on discrimination in places of public accommodation prohibited their former employers and the administrators of employer-sponsored disability benefits plans from providing a greater level of benefits to individuals with physical disabilities than for

---

[1] Lion Brand contends that the Eleventh Circuit falls on the same side of the circuit split as the Third, Sixth, and Ninth Circuits, citing *Access Now, Inc. v. Sw. Airlines Co.*, 227 F. Supp. 2d 1312 (S.D. Fla. 2002), *appeal dismissed,* 385 F.3d 1324 (11th Cir. 2004). However, it is not apparent from the decision in the *Access Now* appeal that the Eleventh Circuit has weighed in on the website-as-public-accommodation debate. Although the Eleventh Circuit issued a decision in 2021 holding that websites are not places of public accommodation under Title III, it later vacated that decision following rehearing after the district court's injunction expired. *Gil v. Winn-Dixie Stores, Inc.*, 21 F.4th 775 (11th Cir. 2021), *vacating Gil v. Winn-Dixie Stores, Inc.*, 993 F.3d 1266 (11th Cir. 2021).

those with mental disabilities. *Parker*, 121 F.3d at 1008; *Ford*, 145 F.3d at 603; *Weyer*, 198 F.3d at 1107–08. In each case the courts reviewed the categories within the statutory definition of "public accommodation" and determined that a public accommodation is a physical place open to the public. *Parker*, 121 F.3d at 1014 (applying the *noscitur a sociis* canon of statutory construction to the list of examples in 42 U.S.C. § 12181(7)); *Ford*, 145 F.3d at 612–13 (stating that interpreting a public accommodation to be a physical place is "in keeping with the host of examples of public accommodations provided by the ADA, all of which refer to places"); *Weyer*, 198 F.3d at 1114 (reviewing the list in § 12181(7) and applying the "principle of *noscitur a sociis*"). As a result, each court held that while Title III of the ADA would prohibit disability discrimination in access to, for example, an insurance company's offices, it would not govern the content of a long-term disability policy offered by an employer. *See, e.g.*, *Weyer*, 198 F.3d 1114–15 (drawing this distinction and discussing *Parker* and *Ford*).[2]

Other courts have held that Title III's definition of public accommodation includes areas that are not physical structures. *Carparts Distr. Ctr., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12 (1st Cir. 1994); *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557 (7th Cir. 1999). Both cases addressed ADA discrimination claims by

---

[2] In *Peoples*, the plaintiff was a blind credit cardholder who sued the card's servicer, claiming that it violated Title III of the ADA by failing to reasonably accommodate cardholders with vision impairments. The plaintiff had a claim that fraudulent charges were placed on his credit card and the servicer failed to consider his blindness when addressing his fraud claim and refusing to credit his account for disputed charges. 387 F. App'x at 181–82. Following the decision in *Ford*, the *Peoples* court found that the plaintiff's claim failed as a matter of law because public accommodations to which Title III applied are limited to physical locations. *Id.* at 183–84.

plaintiffs whose lifetime benefits under insurance policies for medical care for AIDS were capped at a lower amount than the cap for other conditions.

In *Carparts*, the plaintiff alleged that his employer's health benefit plan violated the ADA because it limited lifetime benefits for illnesses related to AIDS to $25,000, but provided $1,000,000 in lifetime benefits for other conditions. *Id.* at 14–15. The *Carparts* court found the district court erred in interpreting the term public accommodations in Title III to be "limited to actual physical structures with definite physical boundaries which a person physically enters for the purpose of utilizing the facilities or obtaining services therein." *Id.* at 18. In reaching the conclusion that "a place of public accommodation" was not so limited, the court observed that the definition of a public accommodation "includes a 'travel service,' a 'shoe repair service,' an 'office of an accountant, or lawyer,' an 'insurance office,' a 'professional office of a healthcare provider,' and 'other services establishments.'" *Id.* at 19 (quoting 42 U.S.C. § 12181(7)(F)). According to the First Circuit, "[t]he plain meaning of the terms do not require 'public accommodations' to have physical structures for persons to enter." *Id.*

> Congress clearly contemplated that 'service establishments' include providers of services which do not require a person to physically enter an actual physical structure. Many travel services conduct business by telephone or correspondence without requiring their customers to enter an office in order to obtain their services. Likewise, one can easily imagine the existence of other service establishments conducting business by mail and phone without providing facilities for their customers to enter in order to utilize their services. It would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. Congress could not have intended such an absurd result.

10

*Id.*

Further, the *Carparts* court found its interpretation was consistent with the legislative history of the ADA. *Id.* The court said that a person reading the "Committee Report describing the operations of Title III could easily come away with the impression that it is primarily concerned with access in the sense of either physical access to a place of public accommodation or something analogous, such as access provided through telephone lines, messengers or some other medium." *Id.* at 19–20. The *Carparts* court concluded:

> Neither Title III nor its implementing regulations make any mention of physical boundaries or physical entry. Many goods and services are sold over the telephone or by mail with customers never physically entering the premises of a commercial entity to purchase the goods or services. To exclude this broad category of businesses from the reach of Title III and limit the application of Title III to physical structures which persons must enter to obtain goods and services would run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public.

*Id.* at 20.

Similarly, the Seventh Circuit's decision in *Doe v. Mutual of Omaha* involved a claim that a medical insurer violated the ADA when it capped insurance benefits for medical care for AIDS at $25,000, as opposed to the limit of $1,000,000 for other conditions, in violation of the ADA. 179 F.3d at 558. The *Doe* court expressly relied on *Carparts*. *Id.* at 559. The Seventh Circuit explained that "[t]he core meaning of [§ 12182(a)], plainly enough, is that the owner or operator of a store, hotel, restaurant,

dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space . . .) that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do." *Id.* However, the *Doe* court ultimately reversed the district court's conclusion that the insurer's policies violated Title III of the ADA because the statute does not require an insurer to alter the products it sells—only to provide equal access to those products. *See id.* at 560–65.

In sum, while some appellate courts have found that Title III only applies physical structures and others have disagreed, they all reached those conclusions in cases that did not specifically consider whether Title III's protections extend to website accessibility.

## C. District Court Decisions

More recently, district courts have been asked to decide whether websites are themselves places of public accommodation under the ADA, and many have held that they are. *E.g.*, *Chalas v. Pork King Good*, 673 F. Supp. 3d 339 (S.D.N.Y. 2023); *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196 (D. Mass. 2012); *Mejico v. Alba Web Designs, LLC*, 515 F. Supp. 3d 424 (W.D. Va. 2021).

In *Pork King Good*, for example, the blind plaintiff alleged that the defendant sold products on its website in violation of Title III of the ADA because the website was not accessible for those that require the use of screen-reading software. 673 F. Supp. 3d at 341. The court examined the state of the law regarding the need for a nexus between a physical place and the plaintiff's claims, and it found the statutory language ambiguous because "the statutory text—unsurprisingly in light of the ADA's pre-Internet vintage—does not

cleanly resolve whether Title III applies to commercial websites." *Id.* at 342–44 (cleaned up). The Court looked to the legislative history and purpose of the ADA and reasoned that "[a] holding today that limits places of public accommodation to the brick-and-mortar standard would severely hamper Congress' effort to protect disabled persons who want and need access to the growing number of online-only providers of goods and services. Such an anomalous result could not have been Congress' intention." *Id.* at 344.

In *National Association of the Deaf v. Netflix* ("*NATD*") the District of Massachusetts reached a similar conclusion to the *Pork King Good* case using similar reasoning. In particular, the *NATD* court noted that "while . . . web-based services did not exist when the ADA was passed in 1990 and, thus, could not have been explicitly included in the Act, the legislative history of the ADA makes clear that Congress intended the ADA to adapt to changes in technology." 869 F. Supp. 2d at 200–01 (citing H.R. Rep. 101–485(II), at 108 (1990), 1990 U.S.C.C.A.N. 303, 391 ("The Committee intends that the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times.")). The court also observed that "Congress did not intend to limit the ADA to the specific examples listed in each category of public accommodations," and that the plaintiffs needed only to show that the defendant's "web site falls within a general category listed under the ADA." *Id.* (citing S. Rep. No. 116, at 59 (1990) ("Within each of these categories, the legislation only lists a few examples and then, in most cases, adds the phrase 'other similar' entities. The Committee intends that the 'other similar' terminology should be construed liberally consistent with the intent of the legislation. . . ."); H.R. Rep. No. 485 (III), at 54

(1990), 1990 U.S.C.C.A.N. 445, 477 ("A person alleging discrimination does not have to prove that the entity being charged with discrimination is similar to the examples listed in the definition. Rather, the person must show that the entity falls within the overall category.")). The *NATD* court said that Netflix's "watch instantly" streaming platform would qualify either as a "'service establishment' in that it provides customers with the ability to stream video programming through the internet; a 'place of exhibition or entertainment' in that it displays movies, television programming, and other content; and a 'rental establishment' in that it engages customers to pay for the rental of video programming." *Id.* at 201.[3] *See also Chalas v. Barlean's Organic Oils, LLC*, No. 22 Civ 04178 (CM), 2022 WL 17156838, at *5 (S.D.N.Y. Nov. 22, 2022) ("I confess to being of two minds on this issue. The reasoning of the Circuit Courts of Appeal that have concluded that Title III requires a nexus between the provision of services and some 'place' is persuasive, given that the statute requires a 'place of public accommodation' and the regulations promulgated thereunder refer only to physical locations. On the other hand, a website is not inconsistent with the noun 'place;' a website is a location in the space known as the internet, and the word 'place' can be defined as a particular position or point (i.e., a location)."); *Panarra v. HTC Corp.*, 598 F. Supp. 3d 73 (W.D.N.Y. 2022) (holding that a deaf plaintiff adequately alleged that defendant's online subscription services fell within categories of public accommodations listed in Title III of the ADA and that defendant violated the ADA by failing to offer closed captioning in its virtual reality programming).

---

[3] The *NATD* court is within the First Circuit and was therefore following the *Carparts* decision.

14

The district court decisions are, however, not uniform, and other courts have held that websites are not places of public accommodation covered by Title III of the ADA. *E.g.*, *Ariza v. Coffee Beanery, Ltd.*, 643 F. Supp. 3d 1334 (S.D. Fla. 2022); *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017 (N.D. Cal. 2012). The *Ariza* court observed the somewhat idiosyncratic development of this area of the law within the Eleventh Circuit, and found that while the plaintiff's complaint did not attempt to assert a claim that the defendant's website was itself a place of public accommodation, it did adequately allege that the website acted as a nexus to the brick-and-mortar stores owned, operated, or controlled by the defendants. 643 F. Supp. 3d at 1339. Meanwhile, the *Cullen* court applied the Ninth Circuit's decision in *Weyer* and held that Netflix's website is not a place of public accommodation because it is not an actual physical place. 880 F. Supp. 2d at 1023–24 (discussing similar decisions from other district courts within the Ninth Circuit).

## III.    Analysis

The parties' arguments understandably track the two distinct trends in the case law—Lion Brand prefers the cases requiring a physical location and the Frosts rely on those that do not. Having considered the parties' arguments, reviewed the relevant caselaw, and consulted the rules of statutory interpretation, the Court holds that a website is a place of public accommodation for purposes of Title III of the ADA. This question is not resolved by the plain language of the statute, and the Court recognizes that there are reasonable

arguments supporting the interpretation advocated by both sides in this case.[4] Nevertheless, the Court rejects Lion Brand's proposed construction and sides with the growing number of district courts that have found websites fall within the protection of Title III for the following reasons.

First, the Court is not persuaded that the outcome here is dictated by cases like *Parker*, *Ford*, and *Weyer*. Aside from the fact that they are non-binding, none of those cases considered the issue before this Court—whether businesses are free to operate websites that deny disabled internet users equal access to the goods and services they offer because of the users' disabilities. Indeed, *Parker*, *Ford*, and *Weyer* each involved the same discrete issue—whether Title III's prohibition on discrimination in places of public accommodation requires a long-term disability insurer to treat mental and physical disabilities the same in the terms of the insurance policy itself. True, in reaching the conclusion that Title III did not apply in that context, each of those decisions reasoned that a public accommodation must be a place that has a "physical structure." However, to conclude that Title III of the ADA does not apply to the *content* of insurance policies did not require the sweeping conclusion that only physical structures are places of public accommodation. In other words, *Parker*, *Ford*, and *Weyer* would have come out the same

---

[4] *E.g.*, *Chalas v. Barlean's Organic Oils, LLC*, No. 22 Civ. 04178 (CM), 2022 WL 17156838, at *5 (S.D.N.Y. Nov. 22, 2022) ("I confess to being of two minds on this issue. The reasoning of the Circuit Courts of Appeal that have concluded that Title III requires a nexus between the provision of services and some 'place' is persuasive, given that the statute requires a 'place of public accommodation' and the regulations promulgated thereunder refer only to physical locations. On the other hand, a website is not inconsistent with the noun 'place;' a website is a location in the space known as the internet, and the word 'place' can be defined as a particular position or point (i.e., a location).").

regardless of whether a Title III place of public accommodation is or is not limited to places that have a "physical structure." *Cf. Sanzone v. Mercy Health*, 954 F.3d 1031, 1039 (explaining that discussion "that is unnecessary to the decision in the case" is dicta).

Moreover, even if the "physical structure" conclusion from *Parker*, *Ford*, and *Weyer* were central to those cases' holdings, this Court respectfully disagrees with such an interpretation of the ADA. The Court finds they allowed the canon of *noscitur a sociis* to play too great a role in their analysis. As the Supreme Court has observed, "[c]anons of construction need not be conclusive and are often countered . . . by some maxim pointing in a different direction." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001). They are "no more than a rule of thumb that can tip the scales when a statute could be read in multiple ways." *Sebelius v. Auburn Regional Med. Ctr.*, 568 U.S. 145, 825–26 (2013) (cleaned up). Application of the *noscitur a sociis* canon alone would result in too narrow a reading of "public accommodation," in part, because the physical-structures-only construction ignores the maxim that a remedial statute should be read broadly. *See Craig v. Dep't of Health, Ed. and Welfare*, 581 F.2d 189, 193 (8th Cir. 1978) (stating that statutes having a remedial purpose should be construed liberally); *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (explaining that "a word in a statute may or may not extend to the limits of its definitional possibilities" and that courts interpreting the term must consider its surrounding text and "the purpose and context of the statute"). Further, their construction also runs counter to ADA's intent, which Congress enacted "to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life" through a comprehensive law targeting widespread

discrimination. *PGA Tour*, 532 U.S. at 674–75; *see also Carparts*, 37 F.3d at 20 (discussing the tension between a physical-structures limitation on Title III and the statute's purpose and congressional intent).

Second, the relevant statutory language does not reflect congressional intent to limit "places of public accommodation" to locations with a "physical structure," excluding places like websites from Title III's coverage. The operative language of Title III prohibits discrimination that prevents a disabled individual from the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of *any place of public accommodation*. . . ." 42 U.S.C. § 12182(a) (emphasis added). Neither that text, nor the twelve broad categories included in the definition of public accommodation in § 12181(7), expressly states limits on the places where disability discrimination is prohibited to those that are "physical structures." *Carparts*, 37 F.3d at 20 ("Neither Title III nor its implementing regulations make any mention of physical boundaries or physical entry."). As the First Circuit recognized, the examples of "service establishments" in § 12181(7)(F) often conduct their business in ways that do not "require[e] their customers to enter an office in order to obtain their services." *Id.* at 19.

Third, contrary to Lion Brand's position, reference to dictionary definitions of the term "place" does not resolve the question. Although contemporary dictionary definitions can be useful in understanding the meaning of an undefined term in a statute, *see, e.g.*, *Riegelsberger v. Air Evac EMS, Inc.*, 970 F.3d 1061, 1064 (8th Cir. 2020), "[t]he definition of words in isolation . . . is not necessarily controlling in statutory construction," *Dolan*, 546 U.S. at 486. Here, the definitions of "place" found in dictionaries around the time of

the ADA's passage refer to buildings and other physical locations, but they do not suggest that all *places* are necessarily *physical structures*. Indeed, during the years just before the passage of the ADA, "place" meant "a portion of space; an area with definite or indefinite boundaries," "an area occupied by or set aside for a specific person or persons," and a "business establishment or office." *The American Heritage Dictionary, Second College Ed.* 946 (1985). Other dictionaries compiled similar ranges of definitions of which an office or building was but one example. *Webster's Dictionary of the English Language, The New Lexicon* 767 (1987) (including "a particular part of space," "position in space, or in some hierarchy, scale, orderly arrangement," "a building or area appointed for a specified purpose"); *The Random House Dictionary of the English Language* 1478 (1987) (including "a particular portion of space, whether of definite or indefinite extent," "space in general," and "a building location, etc., set aside for a specific purpose"). Neither these dictionary definitions, nor the list of examples within the statutory definition of "public accommodation" resolves conclusively the question whether a "place of public accommodation" is limited to physical structures. *Barlean's Organic Oils*, 2022 WL 1716838, at *5 ("[A] website is not inconsistent with the noun 'place;' a website is a location in the space known as the internet, and the word 'place' can be defined as a particular position or point (i.e., a location)."); *see also Mejico v. Alba Web Designs, LLC*, 515 F. Supp. 3d 424, 435 (W.D. Va. 2021) (noting that in *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017), the Supreme Court "characterized 'cyberspace' as 'the most important place[] for the exchange of views'").

This reading of "place" is consistent with Congress's decision to prevent discrimination in "*any* place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added); *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 393–94 (E.D.N.Y. 2017) (reasoning that "the word 'place' was not intended to limit the statute's reach, but 'that Congress likely used the word 'place' because there was no other less cumbersome way to describe businesses that offer those particular goods or services to the public'") (quoting *Nat'l Fed. of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, 572 (D. Vt. 2015)). Preventing discrimination in *any* place does not reflect an unstated intent to allow businesses to deprive disabled individuals equal access to their goods and services whenever those businesses lack a brick-and-mortar store.

In addition, the Court finds that Title III's legislative history supports the conclusion that a stand-alone website like Lion Brand's is a place of public accommodation. This is true even though the ADA was passed prior to the advent of the internet. *See NATD*, 869 F. Supp. 2d at 200–01. In fact, the legislative history reflects that: "Congress intended the ADA to adapt to changes in technology"; and that the specific examples in § 12181(7) were intended only to require a plaintiff to show that the defendant's place of public accommodation "falls within a general category listed under the ADA." *Id.*; *see also Carparts*, 37 F.3d at 19–20 (explaining that the Committee Report supported an interpretation that Congress was "concerned with access in the sense of *either* physical access to a place of public accommodation or *something analogous*, such as access provided through telephone lines, messengers or some other medium") (emphasis added).

Indeed, the stand-alone websites of today, where customers engage in an enormous amount of interstate commerce,[5] reasonably fall into one or more of the categories of public accommodations reflected in the statutory definition. This is especially true when one reads those categories in the context of the injustice Title III of the ADA is meant to remedy. For example, a website operating a store like Lion Brand's is not meaningfully different from a physical "shopping center," and is functionally a "sales or rental establishment"[6] when it comes to the need for disabled persons to have equal access. A brick-and-mortar sales establishment can discriminatorily prevent disabled persons from gaining meaningful access to its goods and services by failing to install ramps for wheelchair access or omitting braille signage to allow vision-impaired customers to find public restrooms. In similar ways, online sales establishments that fail to maintain websites that can be navigated by those who are blind or visually impaired prohibit these customers from gaining equal access to their goods and services because they cannot navigate those websites even when using screen-reader technology. *Morgan v. Joint Admin. Bd., Ret. Plan of the Pillsbury Co. and Am. Fed'n of Grain Millers, AFL-CIO-CLC*, 268 F.3d 456, 459 (7th Cir. 2001) ("The site of the sale is irrelevant to Congress's goal of granting the disabled equal access to sellers of goods and services. What matters is that the good or service be offered to the public.").

---

[5] *Mejico v. Alba Web Designs, LLC*, 515 F. Supp. 3d 424, 434 (W.D. Va. 2021) ("'[W]e shop in virtual marketplaces for everything from luxuries to necessities,' and 'we now rely even more on online shopping in the recent pandemic.'") (quoting *Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 875, 878 (6th Cir. 2020) (McKeague, J., concurring)).

[6] 42 U.S.C. § 12181(7)(E).

The Court is also not convinced by Lion Brand's suggestion that the absence of any amendment of the ADA since the advent of web-based commerce is indicative of Congressional intent to exclude websites from Title III's coverage. Construing a statute by reference to post-enactment legislative silence is a fraught enterprise that rarely yields clear answers. 2B Sutherland Statutory Construction, *Legislative inaction following contemporaneous and practical interpretation* § 49:9 (7th ed.) (describing "legislative inaction" as "a weak reed upon which to lean and a poor beacon to follow to construe a statute"). Here, in the years since the internet has become a place where customers engage in significant commerce, the fact that the ADA has not been amended to expressly include websites in the list of places of public accommodation could just as easily reflect Congress's understanding that no amendment was necessary.

For these reasons, the Court finds that Lion Brand's stand-alone website falls within the meaning of a "place of public accommodation" as defined in Title III of the ADA.

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT** Defendant's Motion to Dismiss is **DENIED**.

Date: February 6, 2025                    *s/Katherine Menendez*
                                          Katherine Menendez
                                          United States District Judge